**CONTRACTORS ASSOCIATION OF EASTERN PENNSYLVANIA, INC., General Building Contractors Association, Inc., Employing Bricklayers Association of Delaware Valley, Inc., and Subcontractors Association of Delaware Valley, Inc., Plaintiffs,**

v.

**CITY OF PHILADELPHIA, Elizabeth Reveal, as Director of Finance for the City of Philadelphia, and Curtis Jones, Jr., as Director of the Minority Business Enterprise Council, Defendants,**

**and**

**United Minority Enterprise Associates, Inc., Intervening Defendant.**

No. 89–2737.

United States District Court, E.D. Pennsylvania.

Jan. 11, 1995.

Thomas J. McGoldrick, John H. Widman, John J. McAleese, Jr., McAleese, McGoldrick & Susanin, P.C., King of Prussia, PA, for plaintiffs.

Seymour Kurland, Dechert, Price & Rhoads, Thomas J. Wamser, Deputy City Sol., James P. Cousounis, Luther E. Weaver, Charles W. Bowser, Bowser, Weaver & Cousounis, P.C., A. Michael Pratt, Chief Deputy City Sol., Karen Singletary, Asst. City Sol., Philadelphia, PA, for defendants.

Robert T. Vance, Jr., Vance, Jackson, Simpson & Vance–Lewis, Philadelphia, PA, for intervenor-defendant.

Carl E. Singley, Philadelphia, PA, for Philadelphia Urban Coalition, Philadelphia Urban League, Minority Enterprise Development Committee.

Charisse R. Lillie, Deputy City Sol., Philadelphia, PA, for Redevelopment Authority of the City of Philadelphia.

Charles C. Hileman, Philadelphia, PA, Richard S. Mailman, Wyncote, PA, for James D. Morrissey, Inc., J.S. McGarvey, Inc.

### MEMORANDUM ORDER WITH SUPPORTING FINDINGS OF FACT AND CONCLUSIONS OF LAW

BECHTLE, District Judge.

## I. INTRODUCTION

This is a facial challenge on constitutional grounds to certain provisions of Chapter 17–500 of the Philadelphia Code ("Chapter 17–500" or "Ordinance"), a City of Philadelphia ("City") ordinance creating preferences, or "set-asides," in City contracting for businesses owned by minorities, women, and handicapped individuals. Presently before the court is the need to determine whether the Ordinance's provision creating a fifteen percent "goal" for black participation in City construction contracting satisfies the strict scrutiny test under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

A nine day non-jury trial was held on this issue between May 31, 1994 and June 20, 1994. Based on the evidence admitted at trial, and the court's findings of fact and conclusions of law as set forth below, the court finds that Chapter 17–500's fifteen percent "goal" for black participation in City construction contracting violates the Equal Protection Clause because it is not "narrowly tailored" to a "compelling government interest." The City is hereby permanently enjoined from enforcing Chapter 17–500's racial preference, and the regulations promulgated

thereunder, in the award of City construction contracts.

## II. BACKGROUND

### A. Summary of the Ordinance

On November 4, 1982, the Philadelphia City Council enacted Chapter 17–500 for the declared purpose of increasing City contracting opportunities for businesses owned by minorities and women, and increasing the number of minority and female-owned businesses within the City of Philadelphia.[1] (Joint Ex. 4 at 501–18.) As originally enacted, Chapter 17–500 contained a fifteen percent "goal" for City contract participation by minority-owned business enterprises ("MBEs"), and a ten percent "goal" for City contract participation by woman-owned business enterprises ("WBEs"). Phila.Code § 17–503(1)(a)–(b) (1982). Chapter 17–500 was later amended to expand its coverage to "disadvantaged business enterprises," and to include a two percent "goal" for City contract participation by handicapped-owned business enterprises ("HBEs").[2] Phila.Code § 17–503(1) (1987). The Ordinance currently applies to all City contracts, whether competitively bid or negotiated, for vending, construction, and personal and professional services. Phila.Code §§ 17–501(6) and 17–503(1).

Chapter 17–500 created an agency known as the Minority Business Enterprise Council ("MBEC") to administer the Ordinance and ensure that its "goals" for minority and female participation are met by both City agencies and prime contractors doing business with the City. Phila.Code § 17–504. Pursuant to § 17–504(2), the MBEC has promulgated regulations for the implementation of Chapter 17–500, and it has certified contractors as eligible to participate in the set-aside program. The MBEC continues to monitor compliance with the Ordinance, and it issues reports to City officials on the effectiveness of the set-aside program.

### B. Summary of the Case and Trial

On April 14, 1989, nine incorporated associations of construction contractors ("contractors") brought suit against the City and various City officials (collectively "City"), pursuant to 42 U.S.C. § 1983, challenging the constitutional validity of Chapter 17–500 and the MBEC regulations under the Equal Protection Clause of the Fourteenth Amendment. The contractors allege, among other things, that the City's use of race-based measures to promote City contracting opportunities for minorities violates the Fourteenth Amendment's guarantee of equal treatment to all persons.

Under the Fourteenth Amendment's guarantee of equal protection of the laws to all persons, classifications based on race are highly suspect. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–98, 109 S.Ct. 706, 721–24, 102 L.Ed.2d 854 (1989). In certain circumstances, local governments have the authority to eradicate the effects of racial discrimination within their legislative jurisdiction; however, this authority must be exercised within the constraints of the Fourteenth Amendment. *Croson,* 488 U.S. at 491–93, 109 S.Ct. at 720–21. A local government may implement race-conscious legislation if the legislation is necessary to redress clear instances of past discrimination and it

---

1. A copy of the Ordinance, as amended, was admitted into evidence as Defendants' Exhibit 101.

2. The Ordinance defines a "Disadvantaged Business Enterprise" as any small business which is at least 51 percent owned by one or more "socially and economically disadvantaged individuals" or, in the case of public corporations, one in which at least 51 percent of the stock is owned by one or more "socially and economically disadvantaged individuals." Phila.Code § 17–501(10).

"Socially and Economically Disadvantaged Individuals" are defined as:

those individuals who have either been subjected to racial, sexual or ethnic prejudice because of their identity as a member of a group or differential treatment because of their disability without regard to their individual qualities, and whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business who are not socially disadvantaged.

Phila.Code § 17–501(11).

All minorities, women and disabled individuals are rebuttably presumed to be "socially and economically disadvantaged individuals." Phila.Code § 17–501(11)(a).

is narrowly tailored to achieve this goal. *Id.* As the Supreme Court stated in *Croson:*

> [b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate.

*Id.* at 505, 109 S.Ct. at 727–28. (citation omitted). Moreover, even if the local government specifically identifies the discrimination that it seeks to remedy, narrowly drawn racial classifications may only be used as a last resort. *Id.* at 519, 109 S.Ct. at 735.

■ Once a challenge to race-conscious legislation has been raised, that party bears the ultimate burden of proving that the legislation is unconstitutional. *Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia,* 6 F.3d 990, 1005 (3d Cir.1993). The local government, in resisting such a challenge, must show a "strong basis in evidence" to support its racial classifications. *Croson,* 488 U.S. at 492, 499–500, 109 S.Ct. at 721, 724–25. The proponent of the legislation must demonstrate that there were actual instances of past discrimination; that the MBE plan is necessary to remedy the discrimination; and that the plan is narrowly tailored to that goal. *Id.* at 491–93, 109 S.Ct. at 720–21. The legislation then must be subjected to searching judicial inquiry under the strict scrutiny standard to determine whether the legislation's race-based measures are "benign" or "remedial," or whether the legislation's racial classifications "are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* at 493, 109 S.Ct. at 721. As the Supreme Court stated in *Croson:*

> the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibili-

ty that the motive for the classification was illegitimate racial prejudice or stereotype. *Id.*

This court has twice granted summary judgment in favor of the plaintiffs because the City failed to produce, in a summary judgment format, sufficient evidence of past discrimination in the Philadelphia construction industry to satisfy the strict scrutiny test. *See Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia,* 735 F.Supp. 1274 (E.D.Pa.1990); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia,* Civ. No. 89–2737, 1992 WL 245851 (E.D.Pa. Sept. 22, 1992).

On appeal, the Third Circuit agreed with this court's finding that the anecdotal and statistical evidence considered by the Philadelphia City Council in 1982 did not provide a sufficient evidentiary basis for Chapter 17–500 to withstand strict scrutiny. *Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia,* 6 F.3d 990, 1002–03 (3d Cir.1993). The Third Circuit, however, found that the City's post-enactment statistical evidence—specifically, a "disparity index" calculated by the City's expert witness, Dr. Andrew F. Brimmer ("Dr. Brimmer")—established a *prima facie* case of racial discrimination in the award of City construction contracts that was sufficient for the City to withstand summary judgment. *Contractors,* 6 F.3d at 1007. The Third Circuit held:

> the City's statistical evidence has created an inference of discrimination which the Contractors would have to rebut at trial either by proving a "neutral explanation" for the disparity, "showing the statistics are flawed, ... demonstrating that the disparities shown by the statistics are not significant or actionable, ... or presenting contrasting statistical data."

*Id.* (quoting *Coral Constr. Co. v. King County,* 941 F.2d 910, 921 (9th Cir.1991), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992)). The Third Circuit remanded the case to this court for trial to determine whether Chapter 17–500's fifteen percent "goal" for black participation in City construction contracting is justified by a "compelling government interest," and, if so, whether it is "narrowly tailored" to remedy

specifically identified instances of past discrimination. *Contractors*, 6 F.3d at 1012.

During the trial, the contractors presented the testimony of two witnesses, and over 100 exhibits, to demonstrate that there is no compelling government interest supporting the Ordinance in that discrimination did not exist in the Philadelphia construction industry before the enactment of Chapter 17–500, or since, and Chapter 17–500's racial preference nevertheless denies City contracting opportunities to non-minority contractors solely on the basis of race. In accordance with the articulation by the Third Circuit of the issues to be addressed on remand, the contractors presented the testimony of Dr. George R. LaNoue ("Dr. LaNoue") to demonstrate that Dr. Brimmer's disparity study is scientifically and methodologically flawed. The contractors also presented the testimony of John Smith ("Smith"), General Manager of the Contractors Association of Eastern Pennsylvania, Inc. ("CAEP") and former member of the MBEC, to support their position that racial discrimination did not exist in the Philadelphia construction industry, and that non-minority contractors have been denied the opportunity to participate in a certain percentage of City construction contracts solely because of their race.

In response to the contractors' proof, the City offered the testimony of Dr. Brimmer, and various proponents of the set-aside legislation, to support the City's position that Chapter 17–500's fifteen percent "goal" for minorities is nondiscriminatory because the City had a "compelling government interest" in remedying the effects of past racial discrimination in the Philadelphia construction industry, and that Chapter 17–500 is "narrowly tailored" to achieve this goal. In addition, intervening defendant, United Minority Enterprise Associates, Inc. ("UMEA"), presented the testimony of two minority contractors to demonstrate the positive effect that Chapter 17–500 has had on the Philadelphia construction industry.

After carefully considering all of the evidence submitted at trial, as well as the submissions of the parties in support of their respective positions, the court makes the following findings of fact and conclusions of law.

## III. FINDINGS OF FACT

### A. The Parties, Jurisdiction and Venue

1. Plaintiffs, CAEP; General Building Contractors Association, Inc. ("GBCA"); Employing Bricklayers Association of Delaware Valley, Inc. ("EBA"); and Subcontractors Association of Delaware Valley, Inc. ("SADV"); are four incorporated associations of construction contractors located in the Philadelphia Standard Metropolitan Statistical Area ("Philadelphia SMSA").[3] The individual members of the contractors associations have participated in the past, and continue to participate, as general contractors or subcontractors on city public works projects.

2. Defendant, the City of Philadelphia, is a city of the first class organized and operated in accordance with Title 53, Chapter 44, of the Pennsylvania Statutes Annotated, and the Philadelphia Home Rule Charter.

3. Defendant Elizabeth Reveal is a former Director of Finance for the City. As Director of Finance, she was responsible for the administration of the City Procurement Department, including the administration of the MBEC.

4. Defendant Curtis Jones, Jr. is a former Director of the MBEC.

5. Intervening defendant UMEA is an organization which represents the interests of minority-owned businesses in the Philadelphia area.

6. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

7. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### B. The Plaintiffs Have Demonstrated that Non–Minority Contractors Have Been Denied City Construction Contracts on the Basis of Race

8. The contractors have standing to challenge the constitutionality of Chapter 17–

---

**3.** The Philadelphia SMSA consists of eight counties in the Philadelphia geographic area: Philadelphia County, Montgomery County, Chester County, Delaware County and Bucks County in Pennsylvania; and Gloucester County, Burlington County and Camden County in New Jersey. (Defs.' Ex. 22 at D–6.)

500's fifteen percent "goal" for minority participation in City construction contracts because they have demonstrated that they are "able and ready to bid on contracts [subject to the ordinance] and that a discriminatory policy prevents [them] from doing so on an equal basis." *See Contractors*, 6 F.3d at 995–96 (*quoting Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. Jacksonville*, —— U.S. ——, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993)).

9. Members of the CAEP perform a variety of "heavy and highway" construction projects, including the building of bridges, streets and highways, utility plants, water plants and railroads. (Smith, Tr. 5/31/94 at 31–33.) Most of these projects are let by public bodies, including the City of Philadelphia. (*Id.* at 33–34.)

■ 10. From the 1970s until today, 85 to 90 percent of CAEP members have performed between 30 and 100 percent of the public works projects awarded in the five county Philadelphia area, which is included in the Philadelphia SMSA.[4] (*Id.* at 35–38.) In 1982, CAEP members performed 80 percent of the public works projects in the five county Philadelphia area. (*Id.* at 38.)

11. In the late 1970s, CAEP members would submit up to 100 bids a year to the City for public works projects. (*Id.* at 60.) Much of this work was performed by the contractors' own work forces, an individual contractor usually would not subcontract a portion of a job unless special skills were required to complete that portion. (*Id.* at 77–79.)

■ 12. With the passage of Chapter 17–500 in 1982, non-minority construction contractors were immediately denied the opportunity to compete for fifteen percent of City contract dollars solely on the basis of race. The contractors have proven that they were able and ready to bid on this protected segment of City construction contracts but could not do so for failure to meet Chapter 17–500's race-based participation requirement.[5]

13. Based on the evidence of record, the contractors have established a *prima facie* case of denial of equal protection because the City, under Chapter 17–500, uses a race-based classification as the basis for the award of City construction contracts.

### C. The City Has Not Demonstrated a "Compelling Government Interest" to Justify Chapter 17–500's Racial Preference in Construction Contracts

14. The City contends that it had a "compelling government interest" in implementing Chapter 17–500's racial classifications because pervasive racial discrimination existed

---

4. The court finds that the eight county Philadelphia SMSA is the relevant geographic area for the purpose of the court's inquiry. The court makes this finding for three reasons: First, the City's declared purpose for enacting Chapter 17–500 was to remedy racial discrimination in the Philadelphia metropolitan area. (Joint Ex. 4 at 501–18.)

Second, in fiscal year 1982 (the fiscal year before Chapter 17–500 was enacted) the Procurement Department analyzed City contract information to determine the geographic location of successful bidders, amounts awarded, and the percentage of "sole source" contracts. As a result of this study, the Procurement Department found that 75 percent of City contracts and contract dollars were awarded to firms in the five county Philadelphia area. (Pls.' Ex. 12 at 19.) An additional 12 percent of City contracts and contract dollars were awarded to firms in New Jersey. (*Id.* at 20.) However, less than one percent of City contracts and contract dollars were awarded to firms in Delaware. (*Id.* at 20.) Similarly, Pennsylvania firms located outside the five county Philadelphia area received less than three percent of City contracts. (*Id.*)

Finally, expanding the relevant geographic area beyond the Philadelphia SMSA distorts the court's inquiry because it would unnecessarily expand the number of potentially available contractors of all races without any corresponding evidence that those additional contractors were qualified, willing and able to perform City contracts, or that black contractors located outside the Philadelphia SMSA were discriminated against in the award of City contracts.

5. With the passage of Chapter 17–500, non-minority contractors were forced to engage in "creative subcontracting" to meet the MBE participation requirement of the Ordinance. (Smith, Tr. 5/31/94 at 77–79.) In other words, the non-minority contractor would be forced to break a project that he was otherwise capable of performing into subparts, and then subcontract at least fifteen percent of the project to a minority, in order to satisfy the MBE participation requirement of Chapter 17–500. (*Id.*)

in the Philadelphia construction industry prior to the enactment of the Ordinance. To support this argument, the City contends that, during the three years immediately preceding the enactment of Chapter 17–500, a significant statistical disparity existed between the number of available black contractors in the Philadelphia construction industry and the dollar value of the City construction contracts awarded to these contractors. The City also contends that it acted as a "passive participant" in racial discrimination by supporting discriminatory contractors with City tax dollars. Finally, the City argues that very few black construction contractors were members of the contractors associations because they were excluded on the basis of race.

### 1. *Statistical Disparity*

15. During the course of this litigation, the City retained Dr. Brimmer to determine, among other things, whether black contractors were denied their proportionate share of City construction contracts because of racial discrimination.[6] (Defs.' Ex. 6 at ¶ 11.) Dr. Brimmer purportedly examined statistical, historical and anecdotal evidence relating to participation of MBEs in the construction industry in the Philadelphia metropolitan area, both in the public and private sectors. (*Id.*) Dr. Brimmer's goal was to determine whether MBEs have suffered disparate treatment in bidding and awards for construction contracts let by the City, or by private owners, and, if so, to appraise whether such statistical disparities reflected past or present discrimination. (*Id.*)

16. Dr. Brimmer's "disparity study" entailed a review of the following information: (1) the federal government's 1982 Census of Construction Industries, including the Philadelphia construction industry; (2) a directory and one-page summary of MBEs in the Philadelphia area in 1982, prepared by the City (the "Pre–MBEC Directory"); and (3) a report that the City submitted to the U.S.

Congress, House of Representatives, Committee on Small Business, in March 1982, which contained the total dollar value of City-financed prime contracts awarded to minorities in fiscal years 1979, 1980 and 1981. (*Id.* at ¶ 14.)

17. Based solely on his review of the foregoing information, Dr. Brimmer concluded:

> We have found a substantial statistical disparity in the participation of MBEs in the City of Philadelphia Public Works contracts for fiscal years 1979 to 1981, when compared to their availability in that market, from which we conclude that the disparity is attributable to racial discrimination.

(*Id.* at ¶ 13.)

18. Dr. Brimmer's conclusion that the statistical disparity is attributable to racial discrimination is based on his application of a "disparity index." (*Id.* at ¶ 15.) Dr. Brimmer calculated this "disparity index" by "dividing the percentage participation in dollars of minority groups in the public works contracts awarded by the City of Philadelphia by their percentage availability or composition in the 'population' of Philadelphia area construction firms and multiplying the result by 100." (*Id.*)

19. According to Dr. Brimmer:

> As participation approaches availability, the disparity index approaches 100, and therefore fully equitable participation would achieve an index of 100, whereas complete exclusion would produce a score of 0. Thus, the nearer the measure is to 0 or the lower the value of the disparity index, the greater the extent of racial disparity and the stronger the inference of discrimination. An index of 0 demonstrates discriminatory exclusion.

(*Id.* at ¶ 16.)

20. Dr. Brimmer measured the participation of minorities in City contracting, or the numerator of his disparity equation, by

---

**6.** Dr. Brimmer is the President of Brimmer & Company, Inc., a financial and economic consulting firm located in Washington, D.C. (Defs.' Ex. 6 at ¶ 1.) Brimmer & Company conducts research and advises clients concerning, among other things, trends in economic activity and prospects. (*Id.* at ¶ 2.) Brimmer & Company has consulted on three studies of statistical disparities and discrimination in local markets on behalf of the cities of Atlanta, Georgia; Dade County, Florida; and St. Louis, Missouri. (*Id.* at ¶ 10.)

examining the total value of prime contracts awarded to minorities in fiscal years 1979, 1980 and 1981. (*Id.* at ¶ 18.) Dr. Brimmer divided the dollar value of the five city-financed prime contracts awarded to MBEs in fiscal years 1979, 1980 and 1981 ($667,501.00) by the total amount of all public works contracts awarded by the City ($419,779,641.00), and determined a "participation rate" of 0.1%. (*Id.*)

21. Dr. Brimmer measured the availability of minority contractors in the Philadelphia metropolitan area in 1982, or the denominator of his disparity equation, by dividing the City-supplied figure of 195 available MBEs in the Philadelphia SMSA in 1982, by the federal census figure of 8050 construction firms with employees in the Philadelphia SMSA at that time. (*Id.* at ¶ 19.) This calculation yielded an "availability rate" of 2.4%. (*Id.*)

22. Dr. Brimmer calculated his "disparity index" by dividing the participation rate (0.1%) by the availability rate (2.4%), and multiplying that value (0.04) by 100. (*Id.* at ¶ 20.) This calculation yielded a disparity index of 4, from which Dr. Brimmer concluded "a disparity index of 4 produces a strong inference of racial discrimination because of its proximity to 0 which represents total exclusion." (*Id.* at ¶ 21.)

23. Because no public works contracts were awarded to MBEs in fiscal year 1981, Dr. Brimmer calculated a disparity index of 0 for that year. (*Id.* at ¶ 24.) Dr. Brimmer concluded "a disparity index of 0 represents the purest indicator of discriminatory exclusion." (*Id.*)

24. Dr. Brimmer next examined the proportion of MBE participation in private contracting after the enactment of Chapter 17–500. Based on Dr. Brimmer's review of data compiled by the City's attorneys regarding the amount of MBE participation in privately-funded projects from 1982 through 1987, and the Procurement Department's annual reports of MBE participation in the set-aside program during fiscal years 1985 through

1992, Dr. Brimmer concluded "MBEs … had a disproportionately low participation rate in the private sector construction market and this disparate participation demonstrates racial … discrimination." (*Id.* at ¶ 31.)

25. Because of insufficient data, Dr. Brimmer was unable to calculate a complete disparity index for MBE participation in the private sector construction market. (*Id.* at ¶ 32.) Dr. Brimmer, however, calculated a MBE and WBE participation rate of 2.1% based on information obtained from the results of a mail-in survey of Philadelphia area contractors. (*Id.*) Based on this calculation, and its comparison to much higher MBE and WBE participation rates in public works contracts during fiscal years 1985 through 1989, Dr. Brimmer concluded "the low participation rate of 2.1 in the private contracting sphere during 1982 through 1987 demonstrates disparate treatment, and we can identify no other reason for such disparate treatment but racial and gender discrimination." [7] (*Id.* at ¶ 37.)

26. Dr. Brimmer next compared the membership requirements of the four contractors' associations that are parties to this lawsuit to a City official's tabulation of the number of MBEs who are members of these organizations, and determined that MBEs had a disproportionately low statistical representation in these organizations which could only be explained by racial discrimination. (*Id.* at ¶ 38.) Without examining any other evidence, Dr. Brimmer concluded "[t]hese statistics demonstrate that the associations either totally excluded MBEs … or limited their participation to token levels." (*Id.* at ¶ 39.)

27. After the Third Circuit narrowed this court's inquiry to determine whether discrimination was practiced against blacks, Dr. Brimmer calculated a series of "alternative disparity ratios" to measure the City's utilization of black construction contractors. Using 1982 federal census data instead of

7. According to Dr. Brimmer, MBE participation in City contracting for fiscal years 1985 through 1989 was as follows: 1985, 17.04 percent; 1986, 15.54 percent; 1987, 16.67 percent; 1988, 15.44 percent; and 1989, 19.59 percent. (Defs.' Ex. 6 at ¶ 34.) Dr. Brimmer also stated that in fiscal year 1991, after the court enjoined the City from enforcing the set-asides in Chapter 17–500, MBE participation in City contracting fell to 5.06 percent. (*Id.* at ¶ 35.)

City-supplied figures to compute availability, Dr. Brimmer calculated a disparity index of 37 for City utilization of black-owned construction companies with employees. (Defs.' Ex. 7 at 10, 15.) Dr. Brimmer also recalculated his original disparity ratio to reflect the City's usage of black-owned construction companies. Using a new City-supplied figure of 114 for availability, Dr. Brimmer calculated a disparity index of 11.4. (*Id.*)

28. Finally, Dr. Brimmer concluded that Chapter 17–500's fifteen percent set-aside for black-owned construction companies is narrowly tailored because it provides an incentive for black contractors to "respond vigorously" to cure racial disparities, and because it reflects the need to take into account waivers and exemptions granted because of insufficient MBEs available to perform certain contracts. (*Id.* at 10–11.)

### a. *Dr. Brimmer's Conclusions are Legally Insufficient*

29. Dr. Brimmer has conceded that a statistical disparity, standing alone, is not dispositive of racial discrimination. (Brimmer, Tr. 6/9/94 at 167–68; Tr. 6/10/94 at 112.) Moreover, in *Croson*, the Supreme Court defined the limits of a statistical disparity by stating "[w]here there is a significant statistical disparity . . . an inference of discriminatory exclusion *could* arise." *Croson,* 488 U.S. at 509, 109 S.Ct. at 730 (emphasis supplied) (citations omitted). To establish racial discrimination, the statistical disparity must in some way be linked to additional evidence. Otherwise, an inference of discriminatory exclusion simply cannot be conclusive. *See O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 426 (D.C.Cir.1992) ("The idea that discrimination caused the low percentage [of minority participation] is nothing more than a hypothesis . . .").

30. Dr. Brimmer contends that the testimony of minority contractors before the City Council Committee on Finance in 1982 supports his opinion that racial discrimination existed in the Philadelphia construction industry. (Defs.' Ex. 6 at ¶ 28; Brimmer, Tr. 6/9/94 at 145–54.) However, both this court and the Third Circuit have already held that the anecdotal and statistical evidence considered by City Council in 1982 does not provide a sufficient evidentiary basis for the racial preference in Chapter 17–500 to withstand strict scrutiny. *See Contractors,* 735 F.Supp. at 1295–98; *Contractors,* 6 F.3d at 1002–03. Therefore, Dr. Brimmer's conclusion on this basis is legally insufficient.

31. Dr. Brimmer also contends that historical discrimination against blacks in local trade unions has limited opportunities for blacks to participate as entrepreneurs in the Philadelphia construction industry. (Defs.' Ex. 6 at ¶¶ 29–30; Brimmer, Tr. 6/9/94 at 105–37.) According to Dr. Brimmer:

> The typical construction firm is owned and operated by a person who has "come up" through the industry. Initial entry is via *apprenticeship* programs and *on-the* [sic] *job training. Trade Union membership* is a vital element which can facilitate or restrain advancement in the industry. Progress is from *craftsman* to *supervisor/foreman.* Discrimination has had a seriously adverse effect on blacks' ability to enter and advance through industry ranks.

(Defs.' Ex. 7 at 2) (emphasis in original).

32. To support this conclusion, Dr. Brimmer points to a study of black membership in local trade unions conducted by the City's Commission on Human Relations in 1963. (*Id.* at 3.) The Commission's study concluded that five local unions had "followed customs and practices . . . which have inevitably resulted in the exclusion of non-whites from the particular trades." (*Id.*) Dr. Brimmer believes that discrimination in trade unions in 1963 had an adverse impact on the availability and qualifications of black construction contractors twenty years later in 1982. (*Id.* at 3–4 and 6–7.) According to Dr. Brimmer, exclusion from the unions in the 1960s meant that black contractors were unable to obtain the skills necessary to compete on an equal basis with white contractors for large City public works contracts in the 1980s. (*Id.*)

33. It is unadorned speculation how many qualified black contractors would now be engaged in the Philadelphia construction industry absent discrimination in trade unions in 1963 and thereafter. There is no evidence in the record to support Dr. Brimmer's conclu-

sions, and his theory cannot be used to justify the enactment of a highly suspect racial classification. *See Croson,* 488 U.S. at 498–99, 109 S.Ct. at 724.

34. Dr. Brimmer's theory about trade union discrimination is identical to the argument that Richmond, Virginia used in its attempt to justify the set-aside in *Croson. Id.* at 498, 109 S.Ct. at 724. This argument, however, was unhesitatingly rejected by Justice O'Connor in what is undoubtedly one of the most strongly worded passages of the Supreme Court's opinion:

> While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. Like the claim that discrimination in primary and secondary schooling justifies a rigid racial preference in medical school admissions, an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.
>
> It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, just as it is sheer speculation how many minority medical students would have been admitted to the medical school at Davis absent past discrimination in educational opportunities. Defining these sorts of injuries as "identified discrimination" would give local governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.

*Id.* at 499, 109 S.Ct. at 724–25.

35. In sum, Dr. Brimmer's conclusion that racial discrimination existed in the Philadelphia construction industry is legally flawed because it rests upon assumptions that are insufficient to withstand strict scrutiny.

### b. There is a "Neutral Explanation" for Dr. Brimmer's Disparities

36. Dr. Brimmer contends that a substantial statistical disparity exists between the participation of MBEs in the City public works contracts for fiscal years 1979 to 1981, when compared to their availability in the construction industry, from which he concludes that the disparity is attributable to racial discrimination. There are, however, several neutral explanations for Dr. Brimmer's statistical disparities.

37. When Dr. Brimmer calculated his disparity indexes of 4 for MBE participation in City-financed prime construction contracts during fiscal years 1979, 1980 and 1981; 37 for City utilization of black-owned construction companies with employees during this period; and 11.4 for City utilization of construction companies owned by black men; Dr. Brimmer assumed that all black and non-black contractors were equally qualified, able and willing to perform City-financed public works contracts. Dr. Brimmer never considered how many black contractors *actually* sought to participate in City-financed prime construction contracting.

38. During fiscal years 1979 to 1981, only seven black contractors sought to prequalify to bid on City-financed prime construction contracts. (*See* Pls.' Ex. 60; Defs.' Ex. 102.) Four of these seven black contractors obtained prequalification. (*Id.*) The City ultimately awarded five city-financed prime contracts totalling $667,501.00 to MBEs in fiscal years 1979 to 1981.[8] (Defs.' Ex. 107.) In addition, the City awarded another $689,528.00 in public works contracts to minority contractors between July 1, 1981 and June 30, 1982. (Pls.' Ex. 12 at 24.)

39. According to the City's records, in 1982 there were only 59 black contractors in the Philadelphia SMSA who were certified by the City's Office of Minority Opportunity ("OMO") as qualified to perform City public

8. In Fiscal Year 1979, three public works contracts totalling $129,001.00 were awarded to minorities acting as prime contractors. (Defs.' Ex. 107.) In Fiscal Year 1980, two public works contracts totalling $538,500.00 were awarded to minorities acting as prime contractors. (*Id.*) No public works contracts were awarded to minorities acting as prime contractors in Fiscal Year 1981. (*Id.*)

works contracts.[9] (Defs.' Ex. 17; Defs.' Ex. 18.) During fiscal years 1979 to 1981, many of these black contractors were heavily participating in federally-assisted public works projects, such as the construction of the Market East Train Station, the Center City Commuter Rail Connection, and the Airport High Speed Line.[10] (Pls.' Ex. 16.) During this period, black contractors received more than $50 million in federally-assisted public works contracts, which were also let by the City Procurement department. (Robinson, Tr. 6/8/94 at 78.)

40. None of this information is reflected in Dr. Brimmer's disparity study. Given the sparse participation of blacks in City-financed construction contracts during this period, it is not surprising that a disparity exists between their availability and their participation in this one area of the construction industry. However, when consideration is given to the low number of available, qualified black contractors at this time, and their high level of participation in federally-assisted public works contracts during the same period, it becomes obvious that the disparities measured by Dr. Brimmer are not attributable to racial discrimination in the Philadelphia construction industry.

### c. Dr. Brimmer's Study is Methodologically Flawed

41. In accordance with the Third Circuit's holdings in *Contractors*, the plaintiffs retained Dr. George R. LaNoue ("Dr. LaNoue") to analyze Dr. Brimmer's report, and the data upon which he based his conclusions, to determine whether Dr. Brimmer's study conformed with the standards set forth in *Croson*.[11]

42. On March 22, 1994, Dr. LaNoue issued a report citing substantial flaws in Dr. Brimmer's data and methodology which, in his view, precluded Dr. Brimmer, and the court, from reasonably inferring that black contractors were discriminated against in City contracting. (Pls.' Ex. 2.) According to Dr. LaNoue, Dr. Brimmer's study is flawed both as to his scientific approach as well as to his methodology. (*Id.*)

43. Dr. LaNoue criticized Dr. Brimmer's methodology and conclusions because he:

(a) never made any independent assessment of the number of black and non-black construction firms in the Philadelphia area who were qualified, willing and able to perform City contracts, but instead based his calculations for the disparity ratios on mere headcounts of firms;

(b) improperly mixed data from different sources when calculating the disparity ratios;

(c) relied on the City's figures regarding available MBEs without testing them to see if they were correct;

(d) relied too heavily on census data, which merely indicates the existence of firms but does not indicate their qualifications, willingness, or availability to participate in City contracting;

(e) assumed that all MBEs who were available were also qualified and willing to perform City public works contracts, without testing this assumption by examining the number of MBEs who sought or obtained prequalification for, or actually bid on, City contracts;

(f) never considered the amount of MBE participation in federally-assisted construc-

---

9. OMO certification did not mean that black contractors could bypass the Procurement Department's prequalification requirements; it simply meant that an OMO–certified black contractor had a proven track record of performing City contracts. (*See, e.g.,* Robinson, Tr. 6/8/94 at 8–32.)

10. For a more thorough discussion of black participation in federally-assisted public works contracts, see subsection 1–d, *infra*.

11. Dr. LaNoue is the Director of the Project on Civil Rights and Public Contracts at the University of Maryland in Baltimore. (Pls.' Ex. 2 at 1–3.)

He is also a Professor of Political Science at the University and the Director of its Policy Sciences Graduate Program. (*Id.*) Dr. LaNoue has written four books and dozens of articles on issues of public policy and law. (*Id.*) Recently, his research has focused on the appropriate legal and social science standards for post-*Croson* disparity studies. (*Id.*) One of his books, the *Local Officials Guide to Minority Business Programs and Disparity Studies: Responding to the Supreme Court's Mandate in City of Richmond v. Croson*, National League of Cities (1994), was admitted into evidence as Plaintiffs' Exhibit 3.

**432**

tion projects which were also let by the City Procurement Department;

(g) never considered the services procured, or contracts let, by the City to determine the City's needs;

(h) never considered the specializations of MBEs to determine whether they could fulfill the City's needs;

(i) never made any attempt to verify the accuracy of the anecdotal evidence presented to City Council, nor did he attempt to gather additional anecdotal evidence of racial discrimination;

(j) relied on the City's assertion that MBEs did not participate as subcontractors on any City public works projects let in 1979, 1980 and 1981, without determining whether this statement was accurate; and

(k) never tested any alternative explanations for a disparity and, therefore, could not conclude with any certainty what caused a disparity. (*Id.* at 5–41.)

44. Dr. LaNoue compared Dr. Brimmer's Philadelphia disparity study to studies that Dr. Brimmer prepared for other municipalities and found that the Philadelphia study was far less comprehensive and based on statistical evidence that Dr. Brimmer had previously rejected as statistically insignificant. (*Id.* at 5, 36–37.) For example, in the Philadelphia study, Dr. Brimmer based his conclusion that racial discrimination existed in the private construction market on his review of survey answers provided by non–MBE contractors. However, the return rate for the Philadelphia surveys, 0.32 percent, was far below a 15 percent return rate that Dr. Brimmer rejected as statistically insignificant when he conducted a similar disparity study in Dade County, Florida. (*Id.* at 36–37.)

45. Based upon his examination of Dr. Brimmer's methodology, his comparison of Dr. Brimmer's Philadelphia study to disparity studies conducted by Dr. Brimmer in other municipalities, and his knowledge of post-*Croson* disparity studies in general, Dr. LaNoue concluded that Dr. Brimmer's Philadelphia disparity study was not consistent with either the legal test set forth in *Croson* or established principles of social science. (*Id.* at 38–42.)

46. After carefully examining the record, including the testimony of both expert witnesses at trial, the court finds that Dr. LaNoue's conclusions are correct.

47. In *Croson,* Justice O'Connor stated that a municipality may enact race-based remedial measures if there is "a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors ..." *Croson,* 488 U.S. at 509, 109 S.Ct. at 730. "Qualified," "willing" and "able" are the three pillars of the *Croson* test; *a fortiori,* a municipality may not enact race-based remedial measures unless it determines that qualified, willing and able minority contractors have been excluded from participating in public contracting.

48. Dr. Brimmer never attempted to measure whether qualified, willing and able black contractors were excluded from participating in Philadelphia public contracting. Instead, Dr. Brimmer simply assumed that every black contractor who was available was equally qualified, willing and able to perform City public works contracts. Dr. Brimmer's assumption, however, is not supported by the evidence.

49. First, Dr. Brimmer does not know, with any degree of certainty, how many black contractors were available to perform City public works contracts in 1982. In his 1994 supplemental report, Dr. Brimmer opined that there were 114 black-owned construction companies in the Philadelphia SMSA in 1982. (Defs.' Ex. 7 at 10, 15.) During the trial, however, Dr. Brimmer acknowledged that his availability figure of 114 black-owned construction companies was inaccurate because it included black firms located outside of the Philadelphia SMSA, and black firms that were not construction contractors. (Brimmer, Tr. 6/9/94 at 193–210.) In light of those errors, Dr. Brimmer concluded that the correct availability figure would be 57. (*Id.* at 210.)

50. Second, Dr. Brimmer does not know how many black contractors were willing to perform City public works contracts in fiscal years 1979, 1980 and 1981 because he never examined bidding activity on City public works contracts. (*Id.* at 164–65.) If he had examined bidding activity, Dr. Brimmer would have found that only seven black contractors sought to prequalify to bid on City-financed prime construction contracts during fiscal years 1979 to 1981. (Pls.' Ex. 60; Defs.' Ex. 102.) This fact alone destroys Dr. Brimmer's assumption that every black contractor who was available during these years was willing to perform City public works contracts.

49. Third, Dr. Brimmer could not possibly know how many black contractors were qualified to perform City public works contracts in fiscal years 1979, 1980 and 1981 because he never studied the City's bidding and prequalification procedures for public works contracts. (Brimmer, Tr. 6/9/94 at 190–92.) Moreover, the document that Dr. Brimmer relied upon for determining his availability figures, the Pre–1982 MBE & WBE Report and Directory, does not contain any information about the qualifications of the firms listed. (*See* Defs.' Ex. 104; Defs.' Ex. 16.) Without first examining the City's prequalification requirements, and then comparing these requirements to the qualifications of the black firms that sought to participate in City public works contracting, it is impossible for Dr. Brimmer to conclude that qualified black contractors were excluded from participating in City construction contracts because of discrimination.

52. Fourth, Dr. Brimmer does not know how many black contractors were able to perform City public works contracts in fiscal years 1979, 1980 and 1981 because he never measured black participation in the entire Philadelphia construction industry. As will be discussed more fully herein, Dr. Brimmer never examined the full extent of black participation in subcontracting or federally-assisted public works contracts let by the City. Without examining this information, it is impossible to draw any conclusions about the exclusion of blacks from public contracting.

53. Finally, Dr. Brimmer never measured the number of contractors actually engaged by the City to perform particular services. Dr. Brimmer's disparity ratios were calculated on the assumption that there were 8050 non-minority construction contractors in the Philadelphia SMSA who were qualified, willing and able to perform City public works contracts in 1982. (Defs.' Ex. 6 at ¶ 19; Defs.' Ex. 7 at 15.) As stated above, Dr. Brimmer never examined bidding activity on City public works contracts. If he had examined bidding activity, Dr. Brimmer would have found that only 273 construction companies sought to prequalify to bid on City public works contracts in fiscal year 1980, and that 318 construction companies sought to prequalify to bid on City public works contracts in fiscal year 1981. (Pls.' Ex. 15.) Without measuring the number of contractors actually engaged by the City to perform particular services, it is impossible to determine whether black firms were excluded from performing these services. In addition, it is impossible to determine whether black companies even existed to perform the services required by the City. Without examining this information, it is impossible to draw any conclusions about discrimination in City public works contracting.

54. In sum, the court finds that Dr. Brimmer failed to measure the "relevant statistical pool" necessary to perform an accurate disparity study in accordance with the standards set forth in *Croson.* Because Dr. Brimmer's disparity study contains many serious methodological and scientific flaws, the court finds that Dr. Brimmer's opinions about the existence of discrimination in the Philadelphia construction industry are unreliable.

#### d. *The City's Statistics are not Significant or Actionable*

 55. Dr. Brimmer's statistics are not significant or actionable because they do not accurately measure the extent of black participation in the Philadelphia construction industry in the years prior to the enactment of Chapter 17–500. Dr. Brimmer's disparity study focuses on just one aspect of the Philadelphia construction industry; *i.e.,* black participation in City-financed prime construction

contracts over a three year period. It does not measure black participation in subcontracting. It completely ignores substantial black participation in millions of dollars in federally-assisted public works contracts, including two of the largest public works projects let through the City Procurement Department in recent history. Without measuring black participation in these aspects of the construction industry, it is impossible to evaluate, and misleading to speculate about, the overall representation of blacks in construction expenditures that were awarded by the City. *Croson*, 488 U.S. at 502–03, 109 S.Ct. at 726.

56. The City claims that it does not know what percentage of the total City construction dollars black contractors received as subcontractors on prime contracts let by the City. (Pls.' Ex. 12 at 23.) Before the enactment of Chapter 17–500, the City did not require subcontractors to seek prequalification, and it apparently did not keep records of the subcontractors working on prime contracts let by the City. (Smith, Tr. 5/31/94 at 53–54.)

57. In the face of this potentially damaging flaw to its position, the City declares, without any measurable factual support, that black contractors "did not participate as subcontractors on City Public Works Contracts let in 1979, 1980, and 1981." (Defs.' Ex. 6–G at ¶ 13.) This assertion is based on a cursory review of Procurement Department records conducted by John W. Macklin ("Macklin"), a member of the MBEC staff and a proponent of the legislation. According to the testimony offered into evidence, Macklin's review entailed the following: He first went to a log at the Procurement Department that listed every public works contract let in fiscal years 1979 to 1981. (Pls.' Ex. 63 at 12.) That log contained the name of the prime contractor, the identity of the contract, and the amount of the contract. (*Id.*) Macklin went through the entire log and wrote down any contract and its amount where he recognized, presumably from memory, the contractor to be a minority contractor. (*Id.*) Macklin did not compare the log against any comprehensive list of minority contractors. (*Id.*) He also went to the contract files and looked for

contracts in excess of $30,000.00 that in his view appeared to provide opportunities for subcontracting. (*Id.* at 13.) With that information, Macklin examined some of the project engineer logs for those projects to determine whether minority subcontractors were used by the prime contractors. (*Id.*) Macklin did not look at every available project engineer log. (*Id.*) Rather, he looked at a random 25 to 30 percent of all the project engineer logs. (*Id.*) As with his review of the Procurement Department log, Macklin determined that a minority subcontractor was used on the project only if he personally recognized the firm to be a minority. (*Id.*) Quite plainly, Macklin was unable to determine whether minorities were used on the remaining 65 to 70 percent of the projects that he did not review. When questioned whether it was possible that minority subcontractors did perform work on some City public works projects during fiscal years 1979 to 1981, and that he just did not see them in the project logs that he looked at, Macklin answered "it is a very good possibility." (*Id.* at 16.)

58. Macklin's affidavit, dated May 29, 1992, was part of the data supplied by the City to Dr. Brimmer for use in his study. (*See, e.g.,* Defs.' Ex. 6.) Based on Macklin's unfounded assertion in paragraph 13 that black contractors did not participate as subcontractors, Dr. Brimmer concluded:

> black firms have had few, if any, opportunities to participate with white-owned contractors through sub-contracting and joint ventures. Consequently, they have found it difficult to acquire experience that would develop their capacity to undertake large and complex projects.

(Defs.' Ex 7 at 4.)

59. During cross-examination, Dr. Brimmer was asked whether his reliance on Macklin's affidavit as the basis for his assumption that black firms received no subcontracts during fiscal years 1979 to 1981 was reasonable in light of Macklin's testimony as to the method that he used to develop the facts to make such a statement. Dr. Brimmer responded: "Sir, I have made no presentation to this Court as to participation by black minorities or blacks in subcontract-

ing. I couldn't possibly—either misleading or misinforming the Court because I didn't do it." (Brimmer, Tr. 6/10/94 at 101.)

60. Given the incomplete and imprecise nature of Macklin's survey, and Dr. Brimmer's admission that the survey was unreliable, the court finds that the City's contention that blacks did not participate as subcontractors on City public works contracts during fiscal years 1979 to 1981 to be without merit.

61. Furthermore, even if the City's position that blacks did not participate as subcontractors on City public works contracts was correct, Dr. Brimmer's statistics are not significant or actionable because they omit the extent of black participation in millions of dollars of federally-assisted public works contracts let by the City Procurement Department. *See O'Donnell,* 963 F.2d at 425–26.

62. In the late 1970s, Congress enacted a series of statutes, including the Public Works Employment Act of 1976, 42 U.S.C. § 6701, *et seq.,* which provided billions of dollars of federal funds to state and local governments for use in local public works projects. Many, if not all, of these statutes required at least ten percent minority participation in the public works projects. *See, e.g.,* 42 U.S.C. § 6705(f)(1)(B)(2) (1976). With the passage of this legislation, minority contractors began to participate to a great extent in federally-assisted construction projects. (Joint Ex. 4 at 502–05.)

63. Between 1979 and 1982, more than half of the public works contracts let by the Procurement Department were federally-assisted public works contracts. (Pls.' Ex. 16.) Minorities participated to a large extent in these contracts as subcontractors.[12] (*Id.*) City Procurement Department records for fiscal years 1979, 1980 and 1981 indicate that at least 22 black-owned construction compa-

nies from the Philadelphia SMSA earned more than $18 million as subcontractors on 17 public works contracts let by the City during this period.[13] (*Id.*) At least 15 of these contracts were federally-funded. (*Id.*) In addition, during the trial, Edward W. Robinson, Jr., the former Executive Director of the OMO from 1980 to 1982, testified that in fiscal year 1982 alone, minorities succeeded in obtaining between 20 and 25 federally-assisted public works contracts worth approximately $50 million. (Robinson, Tr. 6/8/94 at 78.)

64. In fiscal year 1979, the Procurement Department awarded 507 public works contracts worth $218,160,102.13. (Pls.' Ex. 13 at 10.) Nearly half of this amount, $106,898,-943.00, was awarded by the City on just six federally-assisted contracts for construction of the Center City Commuter Rail Connection and the Airport High Speed Line. (*Id.* at 17–21.) Although none of these City contracts were awarded to black-owned construction companies acting as prime contractors, several black contractors participated as subcontractors in these and other contracts for construction of the Center City Commuter Rail Connection and the Airport High Speed Line. (Pls.' Ex. 16.) For example, Keystone Steel Construction Co. ("Keystone") of Woodbury, New Jersey, an OMO certified black-owned construction company specializing in the placing of reinforcing steel structure and pre-cast concrete erection, was awarded at least $5,381,092.00 in subcontracts on three contracts for construction of the Market East Train Station and Center City Commuter Rail Connection. (*Id.*) Also, C. Hannah Construction Company ("Hannah"), an OMO certified black-owned construction company located in Philadelphia, was awarded more than $4,600,000.00 in sub-

---

**12.** When Mayor Green vetoed the first version of Chapter 17–500, he specifically noted:

> Between January 1, 1981 and March 31, 1982, minorities obtained $57.2 million in federally-assisted City construction contracts, amounting to 12.8 percent of all such contracts that were let. Since last July 1, [1981] minorities and women obtained $1.6 million of professional services contracts in city operating departments, amounting to 16.3 percent of all such contracts let.

> While I agree with the ends which Bill No. 1174–A seeks to achieve, those ends cannot justify the means used in the bill.
> (Pls.' Ex. 61 at 552.)

**13.** These figures do not include an additional $1.7 million earned by black-owned electrical and construction supply companies in the Philadelphia SMSA. (Pls.' Ex. 16.) Two black-owned construction companies from outside the Philadelphia SMSA earned an additional $1.8 million as subcontractors on these contracts. (*Id.*)

contracts on three of the prime contracts awarded by the City for construction of the Market East Train Station and Center City Commuter Rail Connection and demolition of Philadelphia General Hospital.[14] (Id.)

65. The City's argument that black contractors were discriminated against in the award of City contracts is substantially undermined by the figures for black participation in federally-assisted construction contracts that were also let by the City Procurement Department. It is unclear why Dr. Brimmer never included, nor even mentioned, black participation in federally-assisted construction contracts in either his original or supplemental expert reports.[15] In fact, the City never made any reference to these projects until the contractors uncovered this information from the City's files and presented it at trial.

66. In paragraph 11 of his May 29, 1992 affidavit, Dr. Brimmer states:

At the request of attorneys for the City of Philadelphia, Brimmer and Company examined statistical, historical and anecdotal evidence relating to participation of minority business enterprises (MBEs) ... in the construction industry in the Philadelphia metropolitan area, both in the public and private sectors.... The City of Philadelphia attorneys requested that we determine and document whether MBEs ... have suffered disparate treatment in bidding and awards for construction contracts let by the City or by private owners and to appraise whether such statistical disparities reflected past or present discrimination.

(Defs.' Ex. 6 at ¶ 11.)

67. Dr. Brimmer's omission of any reference to black participation in federally-assisted public works contracts let by the City Procurement Department leads this court to believe either:

(a) Dr. Brimmer's broad assertion that he measured minority participation in the Phila-

delphia construction industry does not cover as wide an inquiry as history and the City's records deserved;

(b) Dr. Brimmer did measure minority participation in the Philadelphia construction industry on a broad front, but for reasons that are unclear, adopted a selective approach in forming his conclusions that resulted in a somewhat narrow, albeit favorable, interpretation of poor minority participation in only one part of the Philadelphia construction industry, which did not include subcontracting or federally-assisted public works contracts; or

(c) Dr. Brimmer measured only that part of the construction industry that the City wanted him to measure, as represented or limited by the information the City furnished, or failed to supply, regarding black participation in subcontracting or federally-assisted public works contracts let by the City Procurement Department.

68. If any one or combination of these circumstances is correct, and if Dr. Brimmer's "disparity study" or opinions are the product of a combination of any of these alternatives, then Dr. Brimmer's conclusions cannot be sound and must, as a matter of law, be rejected. See Daubert v. Merrell Dow Pharmaceuticals, Inc., — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Further, given Dr. Brimmer's conceded failure to measure what we now know to be the sizeable extent of black participation in federally-assisted public works contracts during the relevant period, the court finds that Dr. Brimmer's opinions about the existence of racial discrimination in the Philadelphia construction industry are unreliable. Those conclusions have not been tested, and, indeed, because of the cursory and incomplete nature of the factual data that Dr. Brimmer based his conclusions upon, they are not testable. See Daubert, — U.S. at — - —, 113 S.Ct. at 2796-99. See also In re Paoli R.R.

14. Contract No. 79-4246 was a $1,585,000.00 City-funded contract awarded to Cleveland Wrecking Co. for demolition and alteration of the Philadelphia General Hospital Complex. (Pls.' Ex. 16.) Hannah acted as a fifteen percent subcontractor. (Id.)

15. Provided, of course, that the City furnished this data to Dr. Brimmer.

*Yard PCB Litigation*, 35 F.3d 717, 742–43 (3d Cir.1994).

69. Further, Dr. Brimmer's unhesitating acceptance of the City's assertion that 195 minority construction contractors were qualified, willing and able to perform City public works contracts during the relevant period violates the principles of the scientific method, whereby a hypothesis is tested using different variables that have been determined to be accurate. Dr. Brimmer never attempted to validate the City's availability figure, nor did he even examine the underlying document from which this figure was allegedly obtained. Indeed, testimony at the trial later demonstrated that this number included both black and non-black firms, located both inside and outside of the Philadelphia SMSA, and many of these firms were not involved in the construction industry. Dr. Brimmer simply never bothered to test the figures that were furnished to him. Consequently, any calculations based on these figures resulted in opinions that lacked the necessary "fit" deemed essential to the issue before the court. *Daubert*, —— U.S. at ———––——, 113 S.Ct. at 2796–99; *Paoli*, 35 F.3d at 742–43. *See also United States v. Downing*, 753 F.2d 1224, 1238–39 (3d Cir. 1985).

70. Finally, Dr. Brimmer's statistics regarding the one area of the Philadelphia construction industry that he did purportedly measure, City prime contracting during fiscal years 1979, 1980 and 1981, are not significant. Here, only seven black contractors sought to apply for prequalification to bid on City construction contracts during this period. (Pls.' Ex. 60; Defs.' Ex. 102.) Even if every one of these seven black contractors was unsuccessful in obtaining prequalification, it would not provide a statistically significant basis from which to generalize about the existence of racial discrimination in the Philadelphia construction industry, because there could be any number of neutral reasons why such a small number of contractors could not meet the City's stringent prequalification requirements.[16]

71. In sum, the court finds that Dr. Brimmer's statistics are not significant or actionable because they omit the extent of black participation in subcontracting and federally-assisted public works projects let by the City Procurement Department. Additionally, Dr. Brimmer's statistics regarding black participation in City-financed prime contracts are not significant or actionable because only seven black contractors sought to apply for prequalification to bid on City construction contracts during this period, and the experience of this small number of black contractors, some of whom went on to obtain prequalification and win their bids, does not provide a statistically significant basis from which to generalize about the existence of racial discrimination in the entire Philadelphia construction industry.

72. Assuming as a matter of law that some version of Dr. Brimmer's conclusions could be said to survive the faults concerning the omissions of data and flawed methodology, the court, as a finder of fact, rejects Dr. Brimmer's conclusions. The reasons are very similar to the grounds that supports rejection as a matter of law. The shortcomings in Dr. Brimmer's approach, including the development of the grounds for his opinions and his failure to include pivotal facts in arriving at his conclusions, causes the finder of fact to have no confidence in the scientific nature of Dr. Brimmer's opinions or in the validity of the factors as he crafted them to purportedly support his opinions on the questions to be decided.

### e. *It is Impossible to Present Contrasting Statistical Data Because of Incomplete Information*

73. Without any complete information about black participation in subcontracting or federally-assisted public works projects let by the City Procurement Department, it is quite simply impossible to present contrasting statistical data on black representation in the City's construction industry. *Croson*, 488 U.S. at 502–03, 109 S.Ct. at 726. Even without contrasting statistical data, however, the evidence uncovered at trial suggests that

---

**16.** Actually, some of the black contractors who sought prequalification obtained it and actually won their bids, as evidenced by the fact that black contractors were awarded five City-financed prime contracts worth $667,501.00 in fiscal years 1979 and 1980. (Defs.' Ex. 107.)

the low level of black participation in City-financed prime contracts in the three years immediately preceding the enactment of Chapter 17–500 was not caused by racial discrimination. Instead, based on the evidence of record, the court finds that any statistical disparities can be directly attributed to the low availability of qualified black contractors in the Philadelphia construction industry, and their sizable participation in federally-assisted public works projects, at that time.

### 2. *"Passive Participant"*

■ 74. In *Croson*, the Supreme Court held that a municipality has a compelling government interest in redressing not only discrimination committed by the municipality itself, but also discrimination committed by private parties within the municipality's legislative jurisdiction, so long as the municipality in some way participated in the discrimination to be remedied by the program. *Croson*, 488 U.S. at 491–92, 537–38, 109 S.Ct. at 720–21, 744–45. To satisfy this requirement, "the government actor need not be an active perpetrator of such discrimination; passive participation will satisfy this subpart of strict scrutiny review." *Coral Constr.*, 941 F.2d at 916 (citation omitted). Additionally, "the mere infusion of tax dollars into a discriminatory industry may be sufficient governmental involvement to satisfy this prong." *Id.*

■ 75. As previously stated, the City contends that Chapter 17–500 was enacted because the City had a compelling government interest in remedying past discrimination in the Philadelphia construction industry. The City claims that, even if the City itself was not actively discriminating against minorities, it was at least passively participating in racial discrimination by supporting discriminatory contractors with City tax dollars. The City, however, has not made any showing to support this contention beyond the bare and conclusory statements of City officials that racial discrimination existed in the Philadelphia construction industry. None of the statements made by proponents of the set-aside legislation have been substantiated by any objective evidence. Consequently, these statements have little or no evidentiary value.[17] *Croson*, 488 U.S. at 500, 109 S.Ct. at 725.

76. Presumably, if the City had any evidence of racial discrimination in the Philadelphia construction industry, it would be located in the files of the Philadelphia Commission on Human Relations ("Commission"), the City agency charged with investigating and eliminating discriminatory conduct within the City of Philadelphia. *See* Phila.Code § 9–1101, *et seq.* In October 1979, the City Procurement Department developed standard requirements for the award, execution, and performance of public works contracts.[18] (Pls.' Ex. 11.) As part of these standard requirements, prime contractors who were engaged to perform public works projects are required to "provide equal employment opportunities in connection with all work performed and materials furnished and supplied pursuant to th[e] contract or to any subcontract hereunder." (*Id.* at ¶ 14(a).) The prime contractor is prohibited from discriminating against any employee or applicant for employment on the basis of race, color, religion or national origin, or from discriminating in the award of any subcontract. (*Id.*) The City's standard requirements warn that discrimination will be deemed a "substantial breach" of the public works contract which could subject the prime contractor to an investigation by the Commission and, if warranted, fines, penalties, termination of the

---

17. For example, during the trial, the City presented Oscar Gaskins ("Gaskins"), former general counsel to the General and Specialty Contractors Association of Philadelphia ("GASCAP") and the Philadelphia Urban Coalition, to testify about minority participation in the Philadelphia construction industry during the 1970s and early 1980s. Gaskins testified that, in his opinion, black contractors are still being subjected to racial discrimination in the private construction industry, and in subcontracting within the City limits. (Gaskins, Tr. 6/7/94 at 162–80.) However, when Gaskins was asked by the court to identify even one instance where a minority contractor was denied a private contract or subcontract after submitting the lowest bid, Gaskins was unable to do so. (*Id.* at 181.)

18. Many, if not all, of the City's standard requirements for public works contracts are still in effect.

contract and forfeiture of all money due. (*Id.* at ¶ 14(b) and (c).)

77. Even though the City's antidiscrimination requirements were in place at least three years before the enactment of Chapter 17–500, no evidence was presented at the trial that the Commission ever reviewed or investigated *any* complaints about discrimination in the Philadelphia construction industry. As in *Croson,* "[t]he complete silence of the record concerning enforcement of the city's own antidiscrimination ordinance flies in the face of the [City's] vision of a 'tight-knit industry' which has prevented blacks from obtaining the experience necessary to participate in construction contracting." *Croson,* 488 U.S. at 502, n. 3, 109 S.Ct. at 726, n. 3.

78. From the vantage point of what must be shown to address an equal protection challenge to a race-based ordinance such as Chapter 17–500, the court finds that there is no credible evidence that racial discrimination existed in the Philadelphia construction industry before the enactment of Chapter 17–500. In addition, even if private discrimination did exist in the construction industry, or by individual contractors, there is no evidence that the City acted as a passive participant to such discrimination by using tax dollars to fund public works projects by contractors who practiced discrimination.

### 3. *Membership in Contractors Associations*

79. In *Croson,* the Supreme Court stated that low membership of blacks in trade organizations, standing alone, cannot not establish a *prima facie* case of discrimination, but it could be relevant to the "compelling government interest" inquiry if the city could link it to the number of local MBEs eligible for membership. *Croson,* 488 U.S. at 503, 109 S.Ct. at 726. The Court stated:

> If the statistical disparity between eligible MBE's and MBE membership were great enough, an inference of discriminatory exclusion could arise. In such a case, the city would have a compelling interest in preventing its tax dollars from assisting these organizations in maintaining a racially segregated construction market.

*Id.* (citations omitted).

80. The City contends that it had a compelling government interest in enacting Chapter 17–500's race-based preference because black contractors have historically been denied membership in the contractors associations. To support this argument, the City offers the opinion of Dr. Brimmer that blacks had a disproportionately low statistical representation in the membership of the contractors' associations which could only be explained by racial discrimination. (Defs.' Ex. 6 at ¶¶ 38–40.)

81. Dr. Brimmer's opinion is based on paragraphs 6 through 11 of John Macklin's affidavit. (*Id.* at ¶ 38.) In his affidavit, Macklin states that he reviewed the bylaws of the plaintiffs' associations, and the OMO's 1982 Directory of certified MBEs and WBEs, to determine which of the firms listed by the OMO were eligible for membership in the plaintiffs' associations. (Defs.' Ex. 6–G at ¶¶ 6–7.) Based on this review, Macklin opined that 71 OMO–certified MBEs and WBEs were eligible for membership in the SADV; 27 OMO–certified MBEs and WBEs were eligible for membership in the CAEP; 44 OMO–certified MBEs and WBEs were eligible for membership in the EBA; and 50 OMO–certified MBEs and WBEs were eligible for membership in the GBCA. (*Id.* at ¶¶ 8–11.)

82. In paragraph 40 of his May 29, 1992 affidavit, Dr. Brimmer states:

> Although we are unable to construct disparity indices, we note that City official John Macklin has determined that as of 1982 there were substantial numbers of MBE and WBE firms eligible to members of each of these associations such that representation in CAEP by 1 MBE member, in GBCA by 3 MBE members and 2 WBE members, in SADV by 1 MBE member and 1 WBE member, and 1 MBE member in EBA, demonstrates discriminatory exclusion and token participation.

(Defs.' Ex. 6 at ¶ 40.)

83. Based on his review of Macklin's figures, and without examining any additional

evidence, Dr. Brimmer concluded "[t]hese statistics demonstrate that the associations either totally excluded MBEs ... or limited their participation to token levels." (*Id.* at ¶ 39.)

84. Dr. Brimmer's reliance on Macklin's affidavit is misplaced. First, Macklin does not point to any provision in the associations' bylaws that act to limit or exclude blacks from membership. Second, Macklin does not identify the criteria for membership in the plaintiffs' associations. Without this information, it is impossible to objectively determine how any contractor could be refused membership in the plaintiffs' associations. Third, the 1982 OMO Directory, from which Macklin allegedly determined which MBEs were eligible for membership in the plaintiffs' associations, does not provide any information from which Macklin could have possibly made such a determination.

85. The 1982 OMO Directory is a ten page list of 241 contractors who were certified by the OMO as being "bona fide" MBEs and WBEs. (Defs.' Ex. 17.) The list contains only the name of the firm, the date its application for "bona fide" certification was heard by the OMO, the firm's certification number, and the date that its OMO certification would expire (usually one year after the date of its hearing). (*Id.*) The directory does not contain any information about the size of a firm; the race of its owners; the type of work it performed; a firm's location or principal place of business; whether the firm had any prior experience performing public works projects; whether the firm had any equipment or employees; or the amount of revenue generated by the firm in a given year. (*Id.*)

86. Among other things, the size of a firm, the type of work it performs, and its financial capabilities, are all factors that must be considered before anybody can accurately determine whether a given firm would be eligible for membership in the plaintiffs' associations. Since Macklin never considered any these factors, his opinions about MBE eligibility are unreliable. Furthermore, Dr. Brimmer's blind reliance on Macklin's observations, without any independent analysis or confirmation, is a bizarre scientific technique.

Neither Macklin's unsupported opinions, nor Dr. Brimmer's untested hypotheses, are sufficient for this court to conclude that the contractors' associations discriminated against black contractors.

87. During the trial, the City did not offer any additional evidence to support its claim that the contractors' associations discriminated against black contractors. In fact, the City's claim was undermined by the uncontroverted testimony of John Smith that no black contractor who has ever applied for membership in the CAEP has been denied. (Smith, Tr. 5/31/94 at 30.) Moreover, the evidence presented at trial supports a finding that many black contractors may not have been eligible for membership in the contractors' associations simply because they lacked the resources and skill to perform large public works projects.

88. To be an active member of the CAEP in 1982, a contractor would have to perform on-site construction work of the type that CAEP members would normally perform, such as heavy and highway, utility and railroad construction, or the construction of water and sewer treatment plants. (*Id.* at 27.) The annual dollar volume of work performed by CAEP members in 1982 ranged from $200,000.00 up to millions of dollars. (*Id.* at 28.) Most CAEP members in 1982 had large investments in capital equipment such as heavy construction machinery, loaders, backhoes, and bulldozers. (*Id.* at 28–29.) Such specialized equipment costs between $60,-000.00 for a small backhoe, to $250,000.00 for a bulldozer, and $400,000.00 for an earthmover. (*Id.* at 33.) By comparison, federal census data indicates that 459 out of 528, or 87 percent, of the black-owned construction companies in the Philadelphia SMSA in 1982 did not have any employees, and thus would be unable to complete public works projects. (Pls.' Ex. 5, Table 5.) The remaining 13 percent of black-owned construction companies, or a total of 69 firms, employed an average of only 3.8 employees per firm, and generated average revenues totalling just $291,028.00. (Pls.' Ex. 2 at 20.)

89. Based solely on a comparison of the size of the firms and the amount of revenue generated, it is highly unlikely that more

than a few black contractors would be eligible for membership in the CAEP in 1982. Moreover, the City has not identified even a single black contractor who was eligible for membership in any of the plaintiffs' associations, who applied for membership, and was denied.

90. Evidence of low black membership in the contractors' associations, standing alone, is not probative of discrimination in the Philadelphia construction industry. *Croson*, 488 U.S. at 503, 109 S.Ct. at 726. As the Supreme Court stated in *Croson:*

There are numerous explanations for this dearth of minority participation, including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices. Blacks may be disproportionately attracted to industries other than construction.... The mere fact that black membership in these trade organizations is low, standing alone, cannot establish a prima facie case of discrimination.

*Id.*

91. For the foregoing reasons, the court finds that the City's claim, and Dr. Brimmer's opinion, that the plaintiffs' associations discriminated against black contractors is not supported by the evidence, and it cannot form the basis for the court to conclude that the City had a compelling government interest in enacting Chapter 17–500's race-based preference.

### D. Chapter 17–500's Racial Preference Is Not "Narrowly Tailored" to Remedy Identified Discrimination

██ 92. Due to the court's previous finding that the City did not have a "compelling government interest" in enacting Chapter 17–500's racial preference, it is impossible to assess whether this preference is "narrowly tailored" to remedy prior discrimination because it is not linked to identified racial discrimination in any way. *Croson*, 488 U.S. at 507–08, 109 S.Ct. at 729. Indeed, as noted in section D–2, *infra*, Chapter 17–500's racial preference is not "narrowly tailored" to even the perceived objective declared by City Council as the reason for the Ordinance in the first place. Nevertheless, because the Third Circuit found that the City created a disputed issue of fact on the "narrowly tailored" issue; *see Contractors*, 6 F.3d at 1009; the court makes the following findings of fact on this issue.

### 1. The City Failed to Consider Alternative "Race–Neutral Measures"

93. The City contends it enacted Chapter 17–500 only after race-neutral alternatives proved insufficient to improve minority participation in City contracting. To support this contention, the City points to two programs that were implemented in the late 1960s and early 1970s to assist minorities to compete more effectively in the Philadelphia construction industry. The first of these programs, the Philadelphia Plan, was instituted in the late 1960s to promote the hiring of minorities on public construction sites. (Coleman, Tr. 6/7/94 at 100–11.) The second program, the Philadelphia Urban Coalition's Minority Contractors Training and Assistance Program, was implemented in 1970 to train minority contractors and help them obtain financing and bonding so that they could proceed from one level to the next in the construction industry. (Gaskins, Tr. 6/7/94 at 137.) The City contends these two "race-neutral" programs were unsuccessful, and that City Council considered the efficacy of these programs before it enacted Chapter 17–500.[19] The City's position, however, is

---

19. For the record, neither of these two programs were "race-neutral" as the term is applied in *Croson*. *See Croson*, 488 U.S. at 509–10, 109 S.Ct. at 730. Both programs were implemented for the sole purpose of increasing contracting opportunities for minorities. (Coleman, Tr. 6/7/94 at 100–11; Defs.' Ex. 111; Defs.' Ex. 112; and Defs.' Ex. 113.) The Urban Coalition's program, in particular, was established to provide financial and technical assistance to minority contractors who were unable to obtain credit because they had limited experience. (Defs.' Ex. 112.) In addition, there is no evidence that either of these programs was supported by the City. In fact, the Urban Coalition's Minority Contractors Training and Assistance Program began in February 1970 with a $500,000.00 grant from the federal government's "Model Cities" program. (*Id.*) The initial grant was followed one year later by another federal grant of $700,000.00. (*Id.*)

contradicted by the testimony of its own witnesses and by the defendants' exhibits.

94. First, the evidence submitted at trial suggests that at least one of these programs was successful. In its first eighteen months, the Minority Contractors Training and Assistance Program succeeded in tripling the value of construction contracts awarded to minorities, from $4,000,000.00 awarded to all minority contractors in 1969 to $12,004,268.00 awarded to the program's 144 participants in 1970 and the first half of 1971. (Defs.' Ex. 112.) Oscar Gaskins, the director of the Urban Coalition's program from 1970 until 1974, testified that the Urban Coalition succeeded in fulfilling a number of its program goals. (Gaskins, Tr. 6/7/94 at 148–80.) Between 1970 and 1974, the Urban Coalition guaranteed loans for between 40 and 50 minority contractors. (*Id.* at 148.) In addition, another 70 to 80 minority contractors received non-financial assistance from the Urban Coalition, including assistance with accounting, estimating, and dealing with the Internal Revenue Service, the City Procurement Department, local unions and private contractors. (*Id.* at 151–57.) By 1974, black contractors were obtaining work from the Procurement Department, the Redevelopment Authority, the Philadelphia School District, and the federal government. (*Id.* at 162.) Minority contractors received prime contracts in specialty work such as plumbing, electrical work and street lighting from the City. (*Id.*) Moreover, Gaskins testified that when a minority contractor submitted a bid to the City on a prime contract, and he was the lowest bidder, he got the job. (*Id.* at 180.)

95. Second, there is no evidence that the City considered the effectiveness of these programs when it enacted Chapter 17–500. Indeed, the only evidence that the City offered on this point was the testimony of former City Council President Joseph Coleman ("Coleman") that he was *aware of* these two programs when Chapter 17–500 was enacted in 1982 (but Coleman could not recall any details about the programs). (Coleman,

Tr. 6/7/94 at 100–11.) Contrary to the City's position, a fair reading of the record reveals that City Council was only interested in implementing a set-aside ordinance that was modeled after certain federal legislation enacted by Congress in the late 1970s, and upheld by the Supreme Court in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). (Joint Ex. 4 at 501–13.) City Council was not interested in considering race-neutral measures, and it did not do so.

96. The City's argument that it enacted Chapter 17–500 only after other race-neutral programs proved insufficient to improve minority participation in City contracting is further weakened by the admitted success of the City's Office of Minority Opportunity during the two years immediately preceding the enactment of Chapter 17–500.

97. The OMO was established by the City in October 1980 to certify the credentials of minority contractors who were seeking contracting opportunities from the Urban Mass Transit Authority ("UMTA").[20] (Robinson, Tr. 6/8/94 at 8–9.) Before a minority contractor could participate in the UMTA project, the contractor first had to demonstrate to the OMO that it was, in fact, owned and controlled by minorities (proof of ethnicity was required), and that it was qualified to perform the contract that it was seeking. (*Id.* at 19–23.)

98. As part of its certification process, the OMO conducted extensive on-site inspections of a prospective minority contractor's facilities to determine whether the information contained in the contractor's application for certification was accurate and truthful. (*Id.* at 23–24.) During these on-site inspections, OMO staff members would examine the contractor's financial and corporate records, the number of workers employed by the contractor, the amount of equipment owned by the contractor, the backgrounds of corporate officers, the contractor's prior experience, and whether the contractor kept any supplies on-site. (*Id.* at 23–26.) If the OMO staff determined that the contractor's credentials were

---

20. The UMTA was a federally-funded, $530 million project to build the Center City Commuter Rail Tunnel and Airport High Speed Line. (Robinson, Tr. 6/8/94 at 9.) Because the project was federally-assisted, it contained a ten percent set-aside for minorities.

in order, and after a public hearing, the OMO would certify the contractor as "bona fide" for one year. (*Id.* at 27–29, 85.) After a minority contractor was certified, the contractor would be given a certification number and its name would be placed on a list maintained by the OMO. (*Id.* at 32; Defs.' Ex. 17.) The OMO's list was included in a manual that was made available to non-minority contractors to use as a reference for "bona fide" MBEs that the non-minority contractor could use in the areas for which the MBEs had expertise. (Robinson, Tr. 6/8/94 at 32, 67.)

99. Between April 1982 and August 1983, the OMO certified 241 minority contractors as "bona fide," out of approximately 680 contractors that applied. (*Id.* at 85.) During fiscal year 1982, the OMO succeeded in obtaining 20 to 25 public works contracts, worth approximately $50 million, for OMO–certified MBEs. (*Id.* at 78.) In addition, in 1982 the OMO received an award from the United States Department of Transportation "in recognition of its strong and effective MBE certification procedures and for its exceptional record of MBE contracts awarded in fiscal year 1982." (*Id.* at 77.)

100. Despite the obvious success that the OMO and Urban Coalition had in obtaining contracting opportunities for minorities, there is no evidence that the City has *ever* considered implementing a program designed to expand the goals of the Urban Coalition and OMO programs to provide assistance to disadvantaged contractors of all races.[21] *See Associated Gen. Contractors of California, Inc. v. Coalition,* 950 F.2d 1401, 1417 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

101. In *Croson,* the Supreme Court stated:

---

**21.** In fact, the City abandoned the OMO's strict, but valuable, certification procedures when Chapter 17–500 was enacted in November 1982. (Defs.' Ex. 101.)

**22.** For example, John Smith testified that the City's requirement that contractors must obtain prequalification to bid on a contract at least two weeks prior to the opening of a bid is a "real hassle" because some City agencies, such as the Water Department, may let as many as ten or twelve contracts a month, and a contractor inter-

States and their local subdivisions have many legitimate weapons at their disposal both to punish and prevent present discrimination and to remove arbitrary barriers to minority advancement.

. . . .

Even in the absence of evidence of discrimination, the city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races. Simplification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect. Many of the formal barriers to new entrants may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms. Their elimination or modification would have little detrimental effect on the city's interests and would serve to increase the opportunities available to minority business without classifying individuals on the basis of race. The city may also act to prohibit discrimination in the provision of credit or bonding by local suppliers and banks. Business as usual should not mean business pursuant to the unthinking exclusion of certain members of our society from its rewards.

*Croson,* 488 U.S. at 494, 509–10, 109 S.Ct. at 722, 730.

102. Every fact witness who addressed the City's procurement procedures at trial testified that these procedures created significant barriers to entry to the public works market for contractors of all races.[22] (*See,*

---

ested in bidding on these contracts is required to submit a new prequalification application for each contract. (Smith, Tr. 5/31/94 at 42–43, 60.) Smith testified that the elimination of this requirement would eliminate a lot of unnecessary paperwork and activity. (*Id.*) According to Smith, the CAEP has suggested to the Procurement Department that it should implement a prequalification requirement similar to that used by PennDOT, where contractors prequalify for a

*e.g.*, Smith, Tr. 5/31/94 at 42–43, 60; Gaskins, Tr. 6/7/94 at 134–64.) Some witnesses testified that small contractors, regardless of their race, did not have the willingness or the ability to complete the paperwork, or otherwise fulfill the burdensome administrative requirements, required by the City to participate in its public works projects. (Gaskins, Tr. 6/7/94 at 134–64.) Nevertheless, there is no evidence before this court that the City has ever attempted to identify barriers to entry in its procurement bureaucracy, or that it has substantially altered its procurement procedures, either before or after the enactment of Chapter 17–500 in 1982.

103. The City has the means to enhance City contracting opportunities for disadvantaged contractors of all races, but it has chosen not to use them. Before the City races to resurrect the race-based preference in Chapter 17–500, it should first consider relaxing its prequalification and bonding requirements for disadvantaged contractors of all races. The City could also implement training and financial assistance programs to assist disadvantaged contractors of all races. It could *vigorously* enforce the antidiscrimination provisions of the City Charter and the Procurement Department's standard contracting requirements. Every one of these truly race-neutral alternatives would have little detrimental effect on the City's interests and would serve to increase the opportunities available to minority business without classifying on the basis of race.

### 2. The City's Fifteen Percent "Goal" for Minority Participation Was Not Selected for a Remedial Purpose

104. During the trial, the City suggested that the Ordinance's fifteen percent "goal" for City contract participation by MBEs is "narrowly tailored" because it reflects the need to account for those contractors who

certain range of contracts on an annual basis. (*Id.*)

23. The City has steadfastly argued that the fifteen percent goal for MBEs is necessary to remedy pervasive racial discrimination in the Philadelphia construction industry. However, as the Supreme Court stated in *Croson*, "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a

receive waivers, and for contracts that are exempted from the program. The City has not offered any facts to support this conclusion, nor could it, because very few contractors have ever received waivers of Chapter 17–500's set-aside requirements, and even fewer City contracts have been exempted from the set-aside program. Between July 1, 1987 and June 30, 1990, waivers and exemptions were granted on less than two percent of the City's public works contracts. (*See, e.g.*, Defs.' Ex. 19; Defs.' Ex. 20; Defs.' Ex. 21.) The City has not offered any explanation as to why it is necessary to preserve a fifteen percent set-aside for black contractors when nearly all of the City's public works contracts are included in the set-aside program.

105. The City has also asserted that Chapter 17–500's minority participation "goal" is not related to the minority population of the City of Philadelphia. This argument, however, is contrary to the evidence submitted at trial.[23]

106. When the City Council Committee on Finance met on February 17, 1982 to consider the legislation that would become Chapter 17–500, Carl Singley, one of the drafters of the Ordinance, admitted:

[W]e felt at the time of the drafting that there was not sufficient data available to this Council that would indicate the number of minority businesses that currently exist in Philadelphia and within the surrounding area that would be capable of performing the contracts that the City lets on an annual basis. So the thought in this legislation would first be to ... arrive at essentially ball park figures for percentage purposes, looking at what we felt was a rough approximation, given the absence of a formal survey of our inventory, of the number of businesses capable of perform-

legislative body to determine the precise scope of the injury it seeks to remedy." *Croson*, 488 U.S. at 498, 109 S.Ct. at 724. The City is no doubt offering this argument because it must, due to a record before City Council that shows that it never attempted to determine the scope of the injury it allegedly sought to remedy with the Ordinance.

ing in the four areas discussed in the ordinance.

(Joint Ex. 3 at 42.)

107. When Bill No. 1477 was introduced on September 16, 1982, the sponsors of the Ordinance stated in the preamble:

*Goals. Our goals are reasonable and especially so in light of the actual proportion of minorities and females in the local population.*

(Joint Ex. 4 at 515) (emphasis in original). The sponsors further stated that, in light of the City's 53.65 percent female population and 41.8 percent minority population, the Ordinance's participation goals "reflect a very modest attempt to change what is by any measure a deplorable status quo."[24] (*Id.*)

108. When City Council met to amend Chapter 17–500 in 1988, Councilwoman Joan Specter, one of the original sponsors of the Ordinance, confirmed Carl Singley's admission when she stated:

We didn't do a study to see whether or not ten percent was proper for women or the percentage for minorities was correct. We knew that there were a lot of women out there and a lot of minorities out there and they weren't getting their share. And we set a goal. And it was pretty arbitrary. It was pretty arbitrary. And we sought to encourage. And that's what this does.

(Joint Ex. 4 at 751–52.)

109. The City's fifteen percent preference for MBEs "cannot in any realistic sense be tied to any injury suffered by anyone." *Croson,* 488 U.S. at 499, 109 S.Ct. at 725. Until this court invalidated Chapter 17–500 in 1990, the Ordinance's fifteen percent preference for MBEs was shared by an amalgam of minorities, including blacks, Hispanics, American Indians, Aleuts, Eskimos, Asians

and Native Hawaiians. There is absolutely no evidence that any of these minority groups suffered from racial discrimination in the Philadelphia construction industry. The City's "random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry" leads this court to find that Chapter 17–500's race-based preference is not a "narrowly tailored" remedy for past discrimination.[25] *Id.* at 506, 109 S.Ct. at 728. As with Richmond, Virginia's minority preference, "[t]he gross overinclusiveness of [Philadelphia's] racial preference strongly impugns the city's claim of remedial motivation." *Id.*

### 3. Chapter 17–500's Waivers and Exemptions are Insufficient

110. Pursuant to § 17–505(1):

The MBEC, on its own initiative or at the request of the affected agency, may recommend that an individual contract or contract "package" (i.e., related contracts being bid or awarded simultaneously for the same project or improvement) be made wholly or partially exempt from the [DBE] City contracting goals prior to the advertisement for bids or solicitation of proposals, whenever there has been a determination, reduced to writing and based on the best information available at the time of the determination, that there are an insufficient number of [DBEs] within the Philadelphia [SMSA] to ensure adequate competition and an expectation of reasonable prices on bids or proposals solicited for the individual contract or contract "package" in question.

Phila.Code § 17–505(1).

111. As with the waiver system in *Croson,* Chapter 17–500's waiver system focuses solely on the availability of MBEs; "there is

---

**24.** The legislative history of Chapter 17–500 is replete with references which prove that City Council's enactment of Chapter 17–500 was motivated by racial and gender politics, and not the remediation of any specifically identified discrimination in the Philadelphia construction industry. (*See, e.g.,* Joint Ex. 3 and Joint Ex. 4.)

**25.** Moreover, the City has never sought to explain why it is necessary to preserve the fifteen percent minority participation "goal" for just

blacks, the only minority group still covered by the set-aside. Black construction contractors may have received a windfall from the Third Circuit's most recent decision in this case, but the City has never offered any evidence to show that the fifteen percent goal is a "narrowly tailored" remedy for past discrimination committed against black construction contractors in the Philadelphia construction industry.

no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors." *Croson,* 488 U.S. at 508, 109 S.Ct. at 729. The City never offered any explanation at trial to support this obvious defect in its waiver provision. Given the City's complete failure "to tailor [Chapter 17–500's] remedial relief to those who have suffered the effects of prior discrimination," the court can only conclude that § 17–505(1)'s focus on availability is meant to foster administrative convenience. *Id.* This is not a sufficient justification to withstand strict judicial scrutiny. *Id.*

### 4. *Chapter 17–500's Racial Preference is not Geographically Limited to the Philadelphia Area*

112. The evidence presented at trial demonstrates that Chapter 17–500's racial preference, as it was applied by the City, was never geographically limited to the Philadelphia SMSA. For example, in fiscal year 1989, American Indian Builders, an MBE from Lewiston, New York received more than $6,000,000.00 in subcontracts on City-financed public works contracts for the installation of sewers and water mains. (Defs.' Ex. 20.) Although Lewiston, New York is located well beyond the Philadelphia SMSA, the full amount of American Indian Builders' subcontracts were counted toward § 17–503's racial participation requirement.[26] *(Id.)*

113. Even though Chapter 17–500 contains a provision for waiving its racial preference when there are an insufficient number of DBEs in the Philadelphia SMSA to ensure adequate competition, it is clear that the Ordinance was never applied in such a way that it would remedy prior discrimination in the Philadelphia geographic area. Between July 1, 1987 and June 30, 1990, waivers and exemptions were granted on less than two percent of the City's public works contracts. *(See, e.g.,* Defs.' Ex. 19; Defs.' Ex. 20; Defs.' Ex. 21.) At the same time, millions of dol-

lars in subcontracts were awarded to MBEs from outside the Philadelphia SMSA, and every dollar was counted toward fulfilling Chapter 17–500's minority participation goal. *(Id.)*

114. As Philadelphia's set-aside ordinance was applied before this court's injunction, a successful minority contractor from anywhere in the country enjoyed an absolute preference over other local citizens based solely on their race. The same situation exists today, only now it is worse because a successful black contractor from anywhere in the country enjoys an absolute preference over other local citizens, including other minorities, based solely on his race. It is obvious that Chapter 17–500's remaining fifteen percent preference for black contractors, and only black contractors, is not narrowly tailored to remedy prior discrimination. *Croson,* 488 U.S. at 508, 109 S.Ct. at 729.

### 5. *The Ordinance Does Not Have a Limited Duration*

115. As originally enacted, Chapter 17–500 contained a sunset provision which called for the Ordinance to expire after a period of seven years. Phila.Code § 17–502(2) (1982). In the preamble to Bill No. 1477, the sponsors of the legislation explained:

> While the ordinance could be extended for an additional ten (10) years, such an extension can only be made upon the recommendation of the Minority Business Enterprise Council and then only through the enactment of another ordinance. This procedure assures what amounts to a de novo review of the appropriateness and efficacy of the goals in light of the then existing circumstances.

(Joint Ex. 4 at 516.)

116. Although Chapter 17–500 was not due to expire until 1989, when City Council amended the Ordinance on May 20, 1987 to expand its coverage to DBEs, City Council also extended the effectiveness of Chapter

---

**26.** There is also no evidence that American Indian Builders lost its DBE status after it acquired more than $6 million in subcontracts in fiscal year 1989. *(See, e.g.,* Pls.' Ex. 62 at 20.) In fact, in fiscal year 1990, American Indian Builders received an additional $5 million in subcontracts on City-financed public works contracts. (Defs.' Ex. 21.) This fact alone supports the contractors' argument that Chapter 17–500 is not narrowly tailored to remedy the effects of past discrimination against minorities in Philadelphia.

17–500 until January 1, 1998. Phila.Code § 17–502(2) (1987). Despite the assurances of Chapter 17–500's sponsors in 1982, there is no evidence that City Council conducted a *de novo* review of the appropriateness and efficacy of the program's goals when it amended the Ordinance in 1987. To the contrary, the evidence suggests that City Council was more interested in *protecting* the fifteen percent of City contract dollars set aside for minorities than determining whether Chapter 17–500's racial preference was still appropriate. (*See, e.g.,* Joint Ex. 4 at 526–84.)

117. The Supreme Court in *Croson* warned that if "amorphous" claims of past discrimination were sufficient to justify a racial preference, than racial preferences of any "duration" would be justified. *Croson,* 488 U.S. at 499, 505, 109 S.Ct. at 724, 727. This case is no different. City Council's extension of Chapter 17–500's duration for an additional eleven and one-half years, which occurred more than two years before the Ordinance was due to expire, without any findings that such an extension was necessary, provides additional evidence that Chapter 17–500's racial preference is not a narrowly tailored remedy for specifically identified instances of prior racial discrimination.

## IV. CONCLUSIONS OF LAW

118. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. In this case, the contractors have proven, by a preponderance of the evidence, that Chapter 17–500's fifteen percent "goal" for minority participation in City construction contracting violates the Equal Protection Clause because it denies non-minority contractors the opportunity to compete for a fixed percentage of City contracts based solely on their race. *Croson,* 488 U.S. at 493, 109 S.Ct. at 721.

119. The City has failed to demonstrate that it had a "compelling government interest" in enacting Chapter 17–500's fifteen percent "goal" for minority participation in City construction contracting. *Id.* at 492, 505, 109 S.Ct. at 721, 727. None of the evidence presented by the City identifies racial discrimination in the Philadelphia public or private construction industry that would authorize the use of race-based remedial relief. *Id.* at 498–506, 109 S.Ct. at 724–28. The court, therefore, holds that the City has failed to demonstrate a compelling interest in apportioning City construction contracting opportunities on the basis of race. *Id.* at 505, 109 S.Ct. at 727.

120. Assuming, for the moment, that the City has demonstrated a "strong basis in evidence for its conclusion that remedial action was necessary," the court finds that the City has failed to demonstrate that Chapter 17–500's fifteen percent "goal" for minority participation in City construction contracting is "narrowly tailored" to remedy identified prior discrimination in the Philadelphia construction industry. *Id.* at 507–11, 109 S.Ct. at 729–31.

121. Because the City has failed to identify the need for remedial action in the awarding of City construction contracts, in the face of the contractors' overwhelming evidence that Chapter 17–500 is the product of racial balancing, the court finds that Chapter 17–500's fifteen percent "goal" for black participation in City construction contracting violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

122. The City is hereby permanently enjoined from enforcing Chapter 17–500's racial preference, and the regulations promulgated thereunder, in the award of City construction contracts.